***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission AFFIRMS the Opinion and Award of Deputy Commissioner DeLuca.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. An employer-employee relationship existed between the plaintiff and defendant-employer. Plaintiff was employed by defendant-employer on April 10, 2002.
2. On April 10, 2002, while plaintiff was employed by defendant-employer, the parties were subject to and bound by the provisions of the Workers' Compensation Act and the defendant-employer was insured by American Alternative Insurance Company.
3. All parties were properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and the subject matter.
4. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
5. The plaintiff has been paid compensation based upon an average weekly wage of $544.95.
 ***********
Based upon all of the competent evidence and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 48 years old and had received a high school equivalency diploma. Prior to working with defendant-employer in 1998, plaintiff did not have any back or psychological problems. Plaintiff started working with defendant-employer as a driver and within weeks began working as a repair technician. Plaintiff was considered a good and valued employee by defendant-employer and prior to his back injury, worked without incident or reprimand.
2. On April 10, 2002, plaintiff was lying on the floor repairing a wheelchair when another employee accidentally drove his wheelchair over plaintiff's back. The following morning, plaintiff sought treatment and was told to see an orthopedic specialist. Plaintiff took the recommendation to defendant employer and was informed that Dr. Burroughs, an orthopaedic specialist, could evaluate him.
3. On April 24, 2002, plaintiff presented to Dr. Burroughs for evaluation and treatment. Dr. Burroughs recommended that plaintiff not return to work. Defendants filed a Form 61 denying the claim, contending that the physician who recommended that plaintiff not return to work was unauthorized. The plaintiff returned to work while continuing treatment with Dr. Burroughs, which included participating in physical therapy and eventually undergoing injections for pain. However, the plaintiff continued to suffer back and leg pain.
4. On or about August 1, 2002, Dr. Burroughs again recommended that plaintiff not return to work and defendants again refused to pay temporary total disability benefits. The defendants requested that Dr. Lestini, an orthopedic specialist, examine plaintiff and filed a motion to compel such medical treatment.
5. On September 27, 2002, the parties attended mediation and entered into an agreement whereby defendants accepted plaintiff's claim on a Form 60 and commenced temporary total disability benefits as of August 1, 2002. The parties agreed that plaintiff's medical treatment would be transferred to Dr. Lestini.
6. On December 3, 2002, plaintiff presented to Dr. Lestini for chronic back and leg pain. Dr. Lestini diagnosed a Grade I or II isthmic spondylolisthesis with segmental instability and foraminal stenosis causing radiculopathy. Recognizing that conservative treatment failed to help plaintiff's pain, Dr. Lestini recommended an instrumented bilateral fusion with interbody grafting. Plaintiff was admitted to the hospital from March 17, 2002, through March 21, 2002, during which time Dr. Lestini performed the above procedure from levels L4 to S1.
7. Dr. Lestini continued to treat plaintiff and on April 28, 2003, he indicated that plaintiff could return to work at a desk-type position with no lifting more than 15 pounds and limited flexion and extension, with position changes every two hours. Defendants' nurse case manager, Kathryn Page, performed a job analysis and consulted with defendants' general manager, Joe Johnson, regarding whether plaintiff would be able to return to work. They decided that plaintiff could not perform his regular job and defendant-employer did not have any other employment to accommodate those restrictions at that time. Defendant-employer thereafter informed plaintiff it would not continue paying the entire premium for his health insurance and his coverage would continue under COBRA.
8. On July 9, 2003, plaintiff received a letter from defendant-employer stating that it had created a position for him at his same job location within Dr. Lestini's restrictions of working twenty hours per week. According to the testimony of Joe Johnson at the hearing before the Deputy Commissioner, the newly created position was basically a modification of plaintiff's prior job within Dr. Lestini's restrictions.
9. Plaintiff's first attorney advised him not to return to the position and on July 25, 2003, counsel for defendants filed a Form 24 contending plaintiff unjustifiably refused suitable employment. By an administrative order, the Industrial Commission approved defendants' Application on August 27, 2003. The order also allowed defendants to suspend payment of compensation from July 25, 2003, until plaintiff returned to work and receive a credit for the overpayment of benefits.
10. Plaintiff testified at the hearing before the Deputy Commissioner that on September 2, 2003, he returned to work on light duty but did not receive any employee benefits, such as insurance or holiday pay. During the first week plaintiff performed this light duty work, he received a workers' compensation check for the reduction in his wages due to his reduced hours. However, according to plaintiff's testimony at the hearing before the Deputy Commissioner, he did not receive a supplemental check for his second week of light duty. During these two weeks, plaintiff did not receive any complaints about his work performance from either customers or supervisors.
11. Plaintiff applied for social security disability benefits and was required to present for a psychiatric evaluation with Dr. Meymandi, a psychiatrist on September 10, 2003. During that examination, plaintiff complained that his spine was crushed and he was angry with defendant-employer. He was also very angry that he could not engage in sexual relations or other activities because of his back pain. Plaintiff indicated that he was going to work, but could not make the occupational adjustment.
12. Dr. Meymandi's principal diagnosis was severe passive-aggressive personality disorder. The stressors identified were plaintiff's workplace and his physical pain. Dr. Meymandi recommended counseling and that plaintiff be referred to vocational rehabilitation to find a better workplace environment. He also noted that plaintiff was at high risk and may harm his employers.
13. On September 12, 2003, Juanita Boston of the North Carolina Disability Determination Services notified defendant-employer by memorandum that on September 11, 2003, a report was received from a consulting physician that plaintiff was very angry and there was a concern that he may decompensate to the point where he might go to defendant-employer and harm someone.
14. On that same date, defendant-employer's general manager, Joe Johnson, sent by facsimile a copy of the DDS memorandum to plaintiff's attorney, and delivered a letter to plaintiff informing him that effective September 12, 2003, his employment was terminated as a result of his blatant disregard for and direct violation of company policy. It further stated that plaintiff refused to acknowledge having received or read a handbook provided to him on September 2, 2003, and that plaintiff's unacceptable and inexcusable behavior was witnessed, verified and confirmed by both employees and customers.
15. Defendants refused to reinstate temporary total disability benefits and this matter was scheduled for hearing. At the hearing before the Deputy Commissioner, plaintiff testified that he was angry because he could not do the things he did before his injury and told that to the psychiatrist but also said that he was not so upset as to harm anyone. In regard to his termination, plaintiff testified that he did sign an acknowledgement for the handbook.
16. At the hearing before the Deputy Commissioner, the general manager, Joe Johnson, and Bill Wendt, president and owner of defendant employer, testified. Mr. Johnson testified that plaintiff was a good, dependable and valued employee prior to his injury. He stated that plaintiff wore clothing bearing the confederate flag on his first day back to work after his injury and during a meeting. In addition, he testified that plaintiff stated he was unhappy and did not want to be there. Although plaintiff removed the offending clothing, the following day, he wore shorts to work. When asked to change the shorts, plaintiff provided a note from his doctor stating that he needed to wear shorts for a skin condition. Mr. Johnson further testified that over the next two or three days, plaintiff made undermining remarks about the company. Although he did not personally hear any such remarks, Mr. Johnson testified that he received a letter and telephone call about plaintiff's remarks. Mr. Johnson also testified that he put an employee handbook on plaintiff's desk or table and that plaintiff refused to acknowledge receipt of it either verbally or in writing. Finally, Mr. Johnson stated that among the reasons for plaintiff's termination from employment on September 12, 2003, were defendant employer's belief that plaintiff posed a threat to the safety of fellow employees, plaintiff's improper dress and alleged negative statements about defendant-employer.
17. Bill Wendt, president and owner of defendant-employer, also testified at the hearing before the Deputy Commissioner that plaintiff was an excellent employee prior to his injury and that he agreed with the substance of Mr. Johnson's testimony. Mr. Wendt stated that the primary reasons for plaintiff's termination included the DDS memorandum, other employees' statements to him that plaintiff had changed and seemed angry and different as well as plaintiff's statements to customers that they should go somewhere else if they were dissatisfied. Mr. Wendt also testified that he did not personally hear any of these alleged statements. Mr. Wendt also stated that he believed plaintiff's anger stemmed from plaintiff's injury and physical condition after surgery.
18. After defendant employer terminated plaintiff, plaintiff sought employment within his physical restrictions. Plaintiff obtained potential job leads through the classified ads and friends. Plaintiff made a number of telephone calls regarding potential positions and submitted job applications. Plaintiff inquired about or applied for forty to fifty different positions prior to the date of hearing but without success. The majority of those positions required physical activity, which plaintiff was not able to perform because of his work restrictions.
19. At the hearing before the Deputy Commissioner, plaintiff testified that he continued to experience back pain and tingling in his legs.
20. There is insufficient competent evidence of record upon which to find that plaintiff made inappropriate statements regarding defendant-employer since neither of defendants' witnesses actually heard the alleged statements in question.
21. In the psychiatric evaluation and on occasion during the period immediately prior to his termination on September 12, 2003, plaintiff did exhibit extreme anger. The greater weight of the credible evidence indicates that plaintiff's anger resulted from his physical limitations and chronic pain caused by his compensable injury on April 12, 2002, as well as his belief that defendant-employer had not treated him fairly.
22. Pursuant to a Form 60 filed with the Industrial Commission on October 10, 2002, plaintiff's average weekly wage was $545.00, yielding a weekly compensation rate of $363.30.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As a direct result of work assigned to plaintiff on April 10, 2002, plaintiff sustained a specific traumatic incident arising out of and in the course of his employment, which resulted in injury to his back. N.C. Gen. Stat. § 97-2(6).
2. In determining whether the plaintiff's termination from employment on September 12, 2003, would preclude him from receiving workers' compensation benefits, initially defendants must prove, (1) plaintiff was terminated for his conduct, (2) the same misconduct would have resulted in the termination of a non-disabled employee, and (3) the termination was unrelated to plaintiff's compensable injury. An employer's successful demonstration of such evidence is "deemed to constitute a constructive refusal" by the employee to perform suitable work, a circumstance that would bar benefits for lost earnings. McRae v. Toastmaster, Inc., 358 N.C. App. 488,597 S.E.2d 695, (2004).
3. If the plaintiff were able to show that he was unable to perform this suitable work or find comparable work as a direct result of his work-related injuries, he would be entitled to benefits. Id. andSeagraves v. Austin Co. of Greensboro, 12 123 N.C. App. 228,472 S.E.2d 397 (1996).
4. Under Seagraves, the plaintiff would be entitled to benefits if he can demonstrate that work-related injuries, and not the circumstance of the termination, prevented him from either performing alternative duties or finding comparable employment. The test is an inquiry into the circumstances of the injured employee's termination to determine whether the failure to perform is due to an inability to perform or an unwillingness to perform. McRae, supra. In this case, the evidence establishes that plaintiff's anger was produced by his chronic pain as a result of his injury; by the physical limitations he suffered as a result of his injury and his belief that defendant-employer had treated him unfairly after his injury. Although defendants made a special accommodation that allowed plaintiff to continue to work within his restrictions, plaintiff's anger, related to his compensable injury, as well as the compensable injury itself, prevented him from either performing the alternative duties or finding comparable employment. McRae
and Seagraves, supra.
5. As a direct and proximate result of plaintiff's compensable injuries by accident, plaintiff is entitled to compensation for temporary total disability at the rate of $363.30 per week from September 12, 2003, and ongoing until further order of the Commission, subject to a credit for overpayment of compensation benefits to plaintiff from July 25, 2003 to August 27, 2003. N.C. Gen. Stat. § 97-29.
6. As a direct result of plaintiff's compensable injury by accident, the plaintiff is entitled to have defendants pay for all his related medical expenses incurred or to be incurred for so long as such evaluations, examinations and treatments may be reasonably required to effect a cure, give relief and will tend to lessen plaintiff's disability, including reimbursement of his health insurance co-payments. N.C. Gen. Stat. §§97-2(19) and 97-25.
 *********** AWARD
1. Subject to a reasonable attorney's fee hereinafter approved and a credit to defendants for a previous overpayment, defendants shall pay compensation to plaintiff for temporary total disability at the rate of $363.30 per week beginning September 12, 2003, and ongoing until further order of the Commission. Compensation due which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fees hereinafter approved.
2. Defendants shall pay for all of plaintiff's medical expenses incurred or to be incurred as a result of plaintiff's compensable injuries by accident on April 10, 2002, for so long as such evaluations, examinations and treatments may be reasonably required to effect a cure or give relief and will tend to lessen the period of plaintiff's disability.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein to plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel and shall be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This the ___ day of May 2005.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER